UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                     :

In re:                           :      Chapter 11
                                   :

RED BULL TAXI INC.         :

               Debtor.[1]     :      Case No. 16-13153  (    )
                                   :

-------------------------------------------------------X

FIRST DAY AFFIDAVIT OF EVGENY FREIDMAN
PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY
RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK        )
                               ) ss.:
COUNTY OF NEW YORK   )

Evgeny Freidman, being duly sworn, deposes and says:

1.     I am the president, sole director and sole shareholder of Red Bull Taxi Inc., a corporation organized under the laws of the state of New York and the debtor in possession ("Red Bull" or the "Debtor" or the "Company") in the above-captioned chapter 11 case.

2.     In my capacity as president and sole shareholder of the Company, I am familiar with its day-to-day operations, business and financial affairs, and I have hands-on management responsibility with respect to those affairs.

3.     Except as indicated, all facts set forth in this Affidavit are based upon: (i) my personal knowledge; (ii) information supplied to me by others within the Management Company (defined herein) who have financial dealings and lease obligations with the Debtor, and professionals retained to provide advice for those affairs; (iii) my review of relevant documents as well as publicly available information cited herein; and (iv) my opinion based upon my

---

[1] The last four digits of the Debtor's Federal Tax Identification Number are 8276.

3533127

experience and knowledge with respect to the Debtor's operations and financial condition, and with respect to the industry.  I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.   Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

4.      I submit this affidavit (the "<u>Affidavit</u>") pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), filed on November 13, 2016 (the "<u>Petition Date</u>").  I have reviewed the Debtor's petition, and it is true and accurate to the best of my knowledge, and the relief sought therein is essential to ensure the continued operation of the Debtor's business and the preservation of contractual arrangements and jobs, while the Debtor seeks to reorganize under chapter 11 of the Bankruptcy Code.

5.      There is no other or prior bankruptcy case filed by or against the Debtor.   No committee of unsecured creditors was organized prior to the order for relief in the Debtor's Chapter 11 case.

6.      A copy of the board resolution authorizing the Chapter 11 filing is attached to the Petition and incorporated by reference herein.

## I.      The Debtor's Business

### A.      The Debtor's Business Operations

7.      The Debtor is in the business of leasing taxicab medallions and taxicabs and its primary assets are three (3) medallions (the "<u>Medallions</u>") issued by the New York City Taxi and Limousine Commission ("<u>TLC</u>").   These Medallions permit the Debtor, and/or its lessees and sublessees, to perform taxi services.  The Debtor also has possession of and access to the three

2

3533127

vehicles that are operated with the permission granted through the Medallions (the "Taxi Vehicles").

8.      As of the Petition Date, as further discussed below, the Medallions are currently in the physical custody and possession of the TLC, pursuant to a levy by and partial surrender to Capital One Taxi Medallion Finance, a trade name for All Points Capital Corp. ("Capital One"), the primary secured lender to the Debtor.

9.      Operation of the Debtor's Medallions and related Taxi Vehicles is maintained through Tunnel Taxi Management, LLC, a non-debtor management company (the "Management Company"). The Management Company leases the Medallions and the related Taxi Vehicles directly from the Debtor and operates them. The Management Company's monthly base lease obligation to the Debtor is $1,500 per Medallion, totaling $4,500 per month. The Management Company subleases the medallioned Taxi Vehicles to licensed taxi drivers and receives the gross revenues from the operation of the Taxi Vehicles. The Management Company then pays therefrom all expenses associated with the utilization of the Medallions and operation of the Taxi Vehicles, including insurance coverage, vehicle maintenance and repairs. It also generally pays its monthly base lease obligations directly to the Debtor's lenders on behalf of the Debtor.

10.     The Debtor does not maintain its own bank account. The Debtor does not generally have cash receipts. Rather, all cash receipts and all disbursements with respect to the operations of the Medallions are made by the Management Company. The Management Company, in addition to managing the Debtor's Medallions and the Taxi Vehicles also manages the cash receipts and disbursements of other non-debtor companies which own and lease taxi medallions and taxis.

11.     The business and corporate structure described above pursuant to which the

3

3533127

Debtor, as a holding company, leases its three Medallions to a management company, who in turn operates those Medallions by subleasing them to individual drivers, is typical in the industry. This is the structure pursuant to which virtually the entire New York City commercial taxicab industry has operated for many, many years.  Pursuant to this structure, a financier of a Medallion has no relationship, or said more formally, no privity with the management company or the driver.  Although it is the revenues generated through the management company that pay the financier, the lender has no right to pursue the management company for payment of the Debtor's obligations.  Conversely, this also means that a taxicab management company, acting alone, can do nothing to stop a lender's foreclosure against a debtor's medallions and/or taxicabs, which are the lifeblood of the management company's business.

12.     Nonetheless, foreclosure by a lender will have a ripple effect all the way down the supply chain, affecting many individuals, many creditors, and many jobs.   For example, Capital One's foreclosure of the three Medallions owned by this Debtor, Red Bull Taxi, which is being halted by this Chapter 11 filing, would mean that (i) the Debtor, Red Bull Taxi loses its Medallions to its lender and loses its raison d'etre; (ii) the Management Company loses the use of those three Medallions and the ability to operate the three cabs round the clock; (iii) some 9 to 10 taxicab drivers lose their jobs driving the Debtor's medallioned cabs which are managed by Tunnel Management.

13.     By virtue of this Chapter 11 filing, and by seeking to reorganize under Chapter 11, the Debtor seeks to avoid that result.

**B.     History of the Industry and the Problems it Faces**

14.     During the Depression of the 1930's, thousands of drivers descended upon New York City, in the hopes of earning a living picking up fares.  It was said that at one point, New

4

3533127

York had as many as 30,000 cab drivers in a completely unregulated industry, resulting in traffic congestion and unsavory practices. Public concern arose not only over the congestion, but over the maintenance and mechanical integrity of the taxi vehicles as well as over the integrity of the drivers. In 1937, Mayor La Guardia signed the Haas Act which introduced official taxi licenses and the medallion system that remains in place today. The Haas Act resulted in the restriction of cab licenses to some 11,787, a number which held firm over a period of nearly 60 years until 1996 when the TLC began auctioning off new licenses. As of March 14, 2014, in New York City, there were some 13,605 taxicab medallion licenses in existence and 51,398 men and women licensed to drive them. Importantly, 368 of these 13,605 licenses had been auctioned by the City of New York in three separate auctions between November 2013 and March 2014 at prices averaging $1,250,000 per medallion.

15.     The TLC regulations require that owners of taxicab medallions must comply with the following rules, regulations and restrictions, to name a few:

a.      Cabs must be inspected every four months;

b.      Taxicabs must have certain equipment, including partitions, taximeters of a make and type acceptable to the TLC, and a credit card machine;

c.      Drivers must have special licenses, and submit to annual drug tests;

d.      Trip record information, including the location where each passenger is picked up, the total number of passengers, the location where each passenger is dropped off, the time each passenger is dropped off, the total trip mileage, the itemized metered fare for the trip, method of payment, the trip number, and other related information must be constantly made available to the TLC;

e.      50% of all fleets must be handicap accessible through a transitional process with respect to new vehicles placed into service;

f.      The TLC also prescribes other rules, regulations and restrictions regarding: licensing, operations (such as with respect to rates and tolls, EZ Pass requirements, etc.), leasing, record keeping, vehicle conditions, vehicle equipment, medallion transfers, insurance, driving hours, rates, group rides, refusing passengers, solicitation of passengers, driver's programs, etc.).

g.      All new taxis purchased after September 1, 2015 must now be the NYC "Taxi of Tomorrow," based on the Nissan NV200 small commercial van body type.

5

16.     Despite these and other restrictions, medallion owners like the Debtor here paid up to $2,500,000 per medallion[2] to the City, and lenders, like Capital One, provided financing, in some instances 100% financing to medallion holding companies for the purchase of these medallions.   Why?   Because the City provided a monopoly to the medallion owner.   In return for paying a very large sum of money for your license to operate a taxicab, and in return for agreeing to comply with all of the costly regulations and requirements described in paragraph 15, above,  a person owning a medallion company (and its financier) knew that each owned taxicab would enjoy the status of being one of a maximum of 13,605 taxicabs on the road in a City of eight million residents.

### C.     Enter Uber

17.     In 2014, Uber entered the New York City taxicab market.   Its CEO and co-founder, Travis Kalanick had stated: "we don't have to beg for forgiveness because we are legal….[I]f you ask for permission upfront for something that's already legal, you'll never get it. There's no upside to them."   October 30, 2014, Politico New York (Copy annexed hereto as **Exhibit A**).   Similarly, Erin Simpson, a spokeswoman for Lyft, stated in July 2014 "We do not believe [New York City's] licensing and base station rules apply to the Lyft ridesharing model." *Id.*

18.     Sadly, the TLC, which had earned revenues of roughly $400 million in the Fall 2013/Winter 2014 medallion auctions, agreed.   Tens of thousands of Uber and Lyft drivers descended upon New York City (ironically reminiscent of the 1930's history described in paragraph 14, above).   No need to pay $1,000,000 or more for a license when you can do it

---

[2] The highest prices of $2,500,000 were for "handicap accessible" medallions, since the TLC was requiring that in order for a fleet to maintain its license to operate with the City, 50% of the fleet must become handicap accessible.

without permission; no need to have your drivers or your cars regularly put through rigorous testing; no need to file daily ride and revenue reports with the City, and no need to make sure that your cars are environmentally friendly or handicap accessible or comply with the remaining myriad of TLC rules regulations.

19.    The result?  51,000 licensed cabbies who drive 13,600 medallion-licensed vehicles must now compete with tens of thousands of Uber, Lyft and other similar drivers.   Crain's New York Business reported on October 6, 2015 that there were "over 30,000 Uber-affiliated vehicles in New York City today."   A copy of the Crain's article is attached hereto as **Exhibit B**.  The TLC website itself reflects about 40,000 Uber and 10,000 Lyft vehicles on New York City Streets as of the most recently available data.  In other words, four times more Uber and Lyft vehicles alone than taxis.   This has effected the taxicab industry in two ways:  (i) taxicab revenues have dropped, dramatically, as much as 45% such that the management companies cannot demand the kind of rents per shift that they had historically collected from drivers, and in turn, Medallion owners like the Debtor can no longer demand the $2,000 or $2,500 per month rent per Medallion lease (the going rate today is about $1,500 per month).   Thus revenues have dropped precipitously, and the value of the Medallions themselves, virtually all of which are financed, has similarly dropped.   Why pay $1,000,000 for something, i.e., a license to pick up passengers in Manhattan that comes with all sorts of restrictions, when you can do it freely for nothing?

20.    The current value of the Medallions is based on sales, and is difficult to determine, but without question it has fallen precipitously since the February 2014 TLC auction prices. Based on some recent auction results, the value is perhaps as low as $250,000 each, but certainly, in my opinion, no more than $500,000 each.

21.    As a result of all of the above, this is an industry in extremis, but an industry

3533127

which, in the view of many, is valuable to the City of New York, provides hundreds of millions of safe rides per year to millions of passengers, cares about the environment and the handicapped (it is required by TLC regulation to care) and provides tens of thousands of jobs to New Yorkers, many of whom, like your affiant, are first generation Americans.

22.     The automatic stay will give the Debtor the breathing spell it needs to normalize operations, negotiate with its creditors, and propose a plan providing for fair payments to Capital One based on the value of the Medallions (Capital One's collateral) and the revenues that can be achieved from leasing the Medallions and Taxi Vehicles.   Absent a restructuring, other creditors of the Debtor, such as personal injury plaintiffs injured by the operation of Debtor-licensed taxi medallions, taxing authorities, the TLC, professionals, insurance brokers and other creditors who the Debtor owes money to, will have no recourse to the Debtor for payment of their claims.

## II.     Corporate Structure, Management and Debt Structure

### A.     Corporate Structure and Management

23.     I am the President, sole director, and 100% stockholder of the Debtor.  I do not, and will not during the Bankruptcy Case, receive any distributions, dividends, payroll, salary or direct compensation from the Debtor.  The Debtor does not have any other officers or employees; therefore, the Debtor will not have any post-petition payroll and/or distribution obligations, other than for payment of allowed administrative expenses of the estate (including, without limitation, allowed fees and costs of professionals retained in this case with Court approval, and United States Trustee fees).

24.     I am the person generally responsible for and familiar with the Debtor's day-today business operations, books and records, business affairs and general financial condition. The Debtor was incorporated on July 22, 2005 in New York County, and maintains an office at 25

8

East 86th St., Apt. 9F, New York, NY 10028.  A copy of the NYS Department of State, Division

of Corporations Entity Information report is annexed hereto as **Exhibit C**.    The books and

records of the Debtor are maintained there, in my custody.  The Debtor's Medallions are at the

moment located at the TLC's facility in Long Island City, as a result of the Capital One levy.

25.    The Debtor does not have any publicly held shares, debentures, or other securities.

26.    The Debtor has a modest amount of tax obligations, currently unliquidated and

subject to dispute.    Some of these tax obligations are specific to the Medallion-based taxi

industry, including New York City Taxicab and Hail Vehicle Trip Tax.

**B.    Unsecured and Priority Claims**

27.    In addition to the foregoing, the Debtor is party to pending personal injury

litigation matters, a number of which are for alleged significant injuries.  Information regarding

that litigation will be set forth in the Debtors' bankruptcy schedules.  Some of these personal

injury claims have already been asserted but there are also contingent claims related to accidents

that have occurred prepetition, but for which no formal claim has yet been asserted as of the

Petition Date.

28.    The Debtor is self-insured; therefore, it is responsible for valid personal injury,

property damage, and basic economic loss claims, as well as all investigation and litigation

expenses associated therewith.  Ultimately, the Debtor is liable for payment of any judgments or

settlements that result from the lawsuits and claims related to operations pursuant to their

Medallions.  The Debtor has a $30,000 self-insurance retention/deductible.  After payment of the

first $30,000 and after actual payment by the Debtor to the personal injury claimant of any sums

awarded (or settled) to the personal injury claimant in excess thereof, the Debtor's insurance

reimburses the Debtor for all amounts paid in excess of $30,000, but under $100,000.    Said

3533127

differently, the maximum reimbursement to the Debtor from its insurance is $70,000.  After the
$100,000 threshold is hit, and in addition to the first $30,000 paid, the Debtor is fully liable and
responsible for the payment of all claims above that $100,000 limit.

29.    The Debtor also has outstanding vendor claims as will be set forth in the Debtor's
bankruptcy schedules.

### C.    The Capital One Claim

30.    In 2011, the Debtor borrowed the principal amount of $1,950,000.00 from Capital
One (the "Loan") as evidenced by that certain Promissory Note dated as of November 22, 2011
(the "Promissory Note") executed by Debtor and delivered to Capital One.  Debtor's indebtedness
under the Promissory Note was secured by a Security Agreement dated as of November 22, 2011
(the "Security Agreement") executed by Debtor for the benefit of Capital One and a Loan
Agreement dated as of November 22, 2011 (the "Loan Agreement") by and between Debtor and
Capital One.  Pursuant to the Security Agreement, the Debtor granted to Capital One a security
interest in its Taxicab Vehicles and all license and property rights in the Medallions.  I also
personally guaranteed the Debtor's obligations to Capital One.

31.    The Debtor is one of 4 entities affiliated with the Debtor (the "Affiliates") which
that remain obligated for a portion of funds borrowed from Capital One on November 22, 2011.
The other three non-debtor entities collectively own 7 medallions.  The total amount borrowed
from Capital One by Debtor and these Affiliates and together with a larger group of affiliates was
in the aggregate, approximately $50,000,000.  However, in connection with a lot of hard work,
and struggle, and the execution of a number of forbearance agreements with Capital One, that
original $50,000,000 debt amount spread among various affiliates has been paid down to
approximately $6,000,000, various portions of which are owned by the remaining 4 Affiliates.

3533127

Other affiliated entities who had been responsible for portions of the $50,000,000 have been released, and the remaining smaller debt is secured only by the Debtor's three Medallions and the 7 medallions owned by the three remaining Affiliates.  Again, although it is part of a larger lending arrangement, the Debtor's portion of the remaining amount due to Capital One by the Debtor is just $1,891,985.50.

32.     On August 15, 2014 a Forbearance Agreement (the "Forbearance Agreement") was entered into among the Debtor, Capital One and the Debtor's Affiliates.  In connection with the Forbearance Agreement, the Debtor executed an affidavit for judgment by confession (the "Confession of Judgment"), whereby it confessed judgment in the amount of $1,891,985.50.  In the event that the Debtor or the Debtor's Affiliates failed to comply with the terms of the Forbearance Agreement, Capital One was entitled to seek entry of a judgment against Debtor.

33.     There came a time when reduced cash flows, and stressed medallion values, resulting from the competition described above, prevented the Affiliates from making the final $6,000,000 payment due pursuant to the Forbearance Agreement.  Capital One thereupon defaulted the companies and proceeded to enforce its state law remedies, at least against this Debtor.

34.     On October 8, 2015, Capital One filed the Confession of Judgment against the Debtor with the Supreme Court of the State of New York, New York County Clerk's Office, seeking entry of a judgment.  Thereafter, on October 23, 2015, the County Clerk of New York County entered the Judgment against the Debtor for $1,869,622.10.

35.     In or around April of 2016, Capital One repossessed Medallion # 3G27 and the Medallion was placed in storage with the TLC.  Thereafter, due to Capital One's collection efforts, the TLC refused to renew Medallion # 9P55 and Medallion # 3G26 was surrendered to

11

the TLC.

36.    By letter dated October 21, 2016, Capital One delivered to Debtor a Notice of Public Sale of Collateral, whereby it notified Debtor of its intention to hold a public auction on November 14, 2016 at 10:30 a.m. at the offices of Troutman Sanders LLP, 875 Third Avenue, New York, New York, 10022 in order to sell the Debtor's three Medallions.

37.    The Debtor notes that during this period of time, while Capital One was ramping up its collection activities against the Debtor, it had also formed a partnership with Uber.  *See* https://www.capitalone.com/credit-cards/cash-back/uber/, https://newsroom.uber.com/payment-rewards/,http://fortune.com/2016/06/15/capital-one-uber/,

https://www.valuepenguin.com/2015/04/capital-one-partners-uber-20-discount-fares.

38.    As of the date hereof, the total amount that Capital One claims it is owed on the Loan is approximately $2,048,491.27, which includes the Judgment in the amount of $1,869,622.27, plus $167,805.00 in accrued interest as of October 21, 2016, plus *per diem* interest since that date in the amount of $461.00 per day.

## IV.    Plans for this Chapter 11 Case/ Reorganization Strategy

39.    Pursuant to section 542 of the Bankruptcy Code, the Debtor will recover the Medallions, which are property of the bankruptcy estate, and will pursue a reorganization that will be in the best interests of all creditors and stakeholders.

40.    The Debtor intends to continue operating its businesses in the ordinary course, including, upon return of the Medallions to the Debtor pursuant to 11 U.S.C. Section 542, by affixing the Medallions to cabs, and leasing them to the Management company thereby restoring the revenue stream.

41.    Since most operating expenses are paid by the Management Company, the Debtor anticipates, at this time, that the only cash disbursements that will need to be made during the

pendency of this case will be for administrative expenses of the estate, including, without limitation, U.S. Trustee fees and estate professionals' fees, and the only cash receipts will be the monthly lease payment for the Medallions pending and subject to further order of the Court.

42.   The Debtor intends to (i) confirm of a plan of reorganization which will, among other things, restructure the Capital One Loan to permit payment of the Capital One's allowed claim in deferred installment payments over time, while also providing for payment of allowed claims of other creditors.

## V.   Information Required by Local Rule 1007-2

43.   Pursuant to Bankruptcy Rule 1007 and Local Rule 1007-2, this affidavit provides the following information:[3]

44.   Set forth in the attached **Exhibit D** is a list of the names and addresses and where available, telephone numbers, of the creditors holding the twenty largest unsecured claims against the Debtor, excluding insiders, and (where available) the name of the person familiar with the Debtor's account.   This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent unliquidated, disputed, or partially secured, subject to the Debtor's rights to dispute the validity of any claims.

45.   Set forth in the attached **Exhibit E** is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtor.   This list also includes the amount of each claim, a brief description and an estimate of the value of the collateral securing such claim, and, if appropriate, an indication whether such claim is subject to the Debtor's rights to dispute the validity of any claims.

---

[3] Local Rule 1007-2(3) requires disclosure of certain information regarding any committee organized prior to the order for relief in a chapter 11 case.   As no such committee was formed in this case, Local Rule 1007-2(3) is not applicable hereto.

3533127

46.     Set forth in the attached **Exhibit F** is a summary of the Debtor's assets and liabilities.

47.     Set forth in the attached **Exhibit G** is a list of the number and classes of debt securities of the Debtor that is publicly held.   The Debtor does not have publicly held equity securities.

48.     Set forth in the attached **Exhibit H** is a list of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor (other than bank accounts which may be subject to claims or setoff) or agent for any such entity.

49.     Set forth in the attached **Exhibit I** is a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

50.     Set forth in the attached **Exhibit J** is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

51.     Set forth in the attached **Exhibit K** is a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property, where a judgment against the Debtor or a seizure of it property may be imminent.

52.     Set forth in the attached **Exhibit L** is a list of the names of the individuals who comprise the Debtor's existing senior management (including such management's affiliation with other non-debtor entities), their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

53.     Set forth in the attached **Exhibit M** is a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue

3533127

but remaining unpaid (other than professional fees), for the thirty-day period following the Petition Date.

54. Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of the enforceability of, or the validity of any claim, (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing. The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

The foregoing is true and correct to the best of my knowledge and belief.

Dated: New York, New York
         November 13, 2016

                                        /s/
                                        Evgeny Freidman
                                        ANDREEA DUMITRU
                                        PARCALABOIU

SWORN TO before me
this ___ th day of _____, 2016

/s/
Notary Public, State of New York
No. _____
Qualified in New York County
My Commission Expires _____

15

3533127

**EXHIBIT A**
(Politico New York Article)

# POLITICO

## POLITICO NEW YORK

+



Taxis line up at LaGuardia. | AP Photo/Mark Lennihan

## Uber, Lyft, and the end of taxi history

By **DANA RUBINSTEIN** | 10/30/14 05:27 AM EDT

Uber, Lyft and like-minded taxi app companies are so innovative, and so fundamentally different than the livery entities that came before, that the long history of for-hire vehicles and the regulations created to govern them are now academic.

Or such is the case being made by, and for, these champions of the new sharing economy.

Uber C.E.O. and co-founder Travis Kalanick has long argued that his company doesn't need government officials to regulate it because it's a technology platform, not a transportation provider, and it self-regulates itself through customer feedback.

"We don't have to beg for forgiveness because we are legal," he told the Journal last year. "But there's been so much corruption and so much cronyism in the taxi industry and so much regulatory capture that if you ask for permission upfront for something that's already legal, you'll never get it. There's no upside to them."

(On Wednesday, Uber moderated its position, but only slightly.)

Erin Simpson, a spokeswoman for Uber's rival Lyft, told Capital as it was preparing to launch in the New York City market in July, "We do not believe [New York City's] licensing and base station rules apply to the Lyft ridesharing model."

She has a point. The law was developed before they existed.

ADVERTISING



inRead invented by Teads

The New York City taxi industry is in fact as old as the combustion engine itself, or, if you include the taxis' horse-drawn predecessors, far older. And the system of regulation that has evolved along with it isn't pretty, and locks into place a de facto power structure that is sometimes better at protecting the interests of the industry than of riders and working drivers. It is, in this respect, a system that is ripe for the sort of disruption the app companies like to talk about.

But taxi historians (yes, there are taxi historians) interviewed by Capital suggest that the newcomers' post-regulation arguments ignore the reasons that cities created taxi

regulations in the first place.



"Customers don't quite grasp what it would mean to have a regulation-free taxi system—how dangerous it could be, how difficult it could be to control pricing once Uber really did gain a monopoly," said Graham Hodges, a Colgate University history professor and the author of Taxi!: A Social History of the New York City Cabdriver.

He added, "You'll have a lot more accidents, a lot more speeding. And fares would be very chaotic, like they were in the 20s. There are just some historical realities."

Another taxi history, which deals with the decades during which drivers of combustion engine taxis pushed horse-drawn hansom cabs off the streets of New York City, suggests that those progenitors of what was a new business model were as innovative as Uber and Lyft now purport to be, and then some.

According to that book, Gorman Gilbert and Robert Samuels' The Taxicab: An Urban Transportation Survivor, the early motor-taxi operators pioneered traffic signals and telephone networks to facilitate faster driving and dispatching.

John Hertz, a Czech-born car salesman and namesake of the ubiquitous rental-car company, turned second-hand cars into taxis and ended up developing the nation's largest fleet.

"After reading a University of Chicago study that found yellow (with a slight tint of red) to be the most visible color at the greatest distances, he painted his taxis yellow," write Gilbert and Samuels.

(One of the early stop signs was yellow, too.)

Hertz instituted profit-sharing with workers, and kept a doctor, dentist and nurse on staff to service them. He reduced prices, making taxis affordable to the middle class. And he promised to respond to service calls within ten minutes.

Aside from the occasional taxi war, the taxi industry remained relatively calm in the 1920s, and "public regulation of the industry was minimal," write Gilbert and Samuels.

But oversupply soon became a problem, one that the the Great Depression only exacerbated, with throngs of unemployed and underemployed men pouring into the taxi trade to battle for an ever-diminishing share of riders with disposable income.

Before the depression, there were 84,000 taxi drivers in the United States. By 1932 that number had gone up to 150,000, leading to cheap fares, and scenes of chaos on many city streets.

Baruch College entrepreneurship professor Edward Rogoff, in an article for a journal published by The New School, tells of an "oversupply" of taxis in New York City in particular, starting as early as the 1920s. He writes that by 1931, there were 21,000 New York City taxis, compared to 15,000 in 1923, by which time the Times, for example, was already blaming Midtown congestion on taxi oversupply.

Gilbert and Samuels attribute the rapid proliferation in part to the actions of auto manufacturers, who foisted their unsellable cars onto taxi companies, who in turn leased them to drivers desperate for work.

"A manufacturer would 'sell' cars to a taxi operator on favorable financing terms with low down payments," they write. "The cut-rate taxi operator would then lease the cars as taxi to drivers for three to four dollars per day. The drivers had to recoup these lease fees by hustling business legitimately or by some illegitimate means.

"Rate wars flared in cities throughout the country. Rates, which had ranged between forty cents and seventy cents for the first mile, were cut by the new cab operators to fifteen cents and later to ten cents. In some cities, such as Washington, the cut-rate taxis actually were free, and many cities had 'nickel' cabs, which charged five cents for any trip in the city."

Soon, newspapers began demanding more government control.

On September 22, 1932, the Cincinnati Enquirer wrote: "Taxicabs are a public service and should be regulated as such."

The New York Times declared, "The industry cries aloud for regulation."

In 1932, New York City mayor Jimmy Walker responded to the public demand for regulation with a new regulatory scheme, one that rapidly fell apart, in the later accounting of the Seabury Commission, after he took bribes from a taxi company.

New York City's next serious dalliance with taxi regulation bore fruit in 1937 with the passage of the Haas Act, which limited the number of taxi medallions to 13,500.

"Soon taxicab regulation was commonplace," write Samuels and Gilbert.

Cities instituted strict licensure requirements, they regulated fares, insurance coverage, vehicle quality. Increasingly, taxi service was seen as something akin to a public utility.

Over time, the new fleets stabilized, and calcified. By the 21st century, they had developed a reputation for mistreating their workers. They co-opted politicians and stymied innovation

with a litigiousness rivaled only by the personal injury bar.

Then, in recent years, came two big changes. One was the introduction of an outer-borough taxi scheme by Michael Bloomberg, which is almost as tightly regulated as the transitional yellow-taxi business, and is in the process of becoming reality (over the rhetorical and legal objections of the old medallion and some livery-fleet owners).

The other was the arrival of the taxi apps, promising a better future governed by free-market innovation.

"In some ways [the taxi apps] have the perfect prey, because medallion owners are notoriously bad," said Hodges. "The brokers or the fleets, those are not lovely people at all. But I don't see Uber acting as a salvation, and in fact I think they could make matters a lot worse."

Or not. Like everything in the taxi world, its history, and the implications of that history for the contemporary taxi set-up, are hotly contested.

Rogoff, an outspoken medallion-system critic, calls Gorman, who ultimately became a taxi commissioner, "an apologist for the medallion system." (Gorman could not be reached for comment.)

Rogoff agrees that some regulation is needed, particularly to ensure vehicle and driver quality. But by his account, the taxi battles of the 1930s are overemphasized by the other historians, and serve today as rationalizations for a corrupt medallion system.



New York City taxis, 1924. (AP Photo)

At the same time, he says, history has undermined the rationale for the Haas Act that limited medallion numbers in the first place, since after the act was passed, supply of taxis fell below the artificially inflated levels on its own.

"Markets correct for supply and demand," said Rogoff.

Or perhaps, as another taxi historian asserts, the innovation-regulation cycle is unavoidable. That's the argument of Bruce Schaller, a former city transportation deputy commissioner who has written extensively on the issue.

(Rogoff dismissed Schaller as just another guy "on the taxi industry payroll." Schaller responded, "Pay no attention. He is just making stuff up.)

"It's always been contested territory when you have newcomers providing taxi-like service," said Schaller. "So they need to be accountable. And at first they don't really see the need."

To illustrate that historical arc, Schaller pointed to the 1960s and 1970s, and the advent of the gypsy cab.

"It was a long, two-decade process to get the gypsy cabs into the system as for hire vehicles that have a very important and well-regulated place in the transportation universe," he said.

In a study published in 2007 in a journal called Transport Policy, Schaller concluded, "Without entry controls, the cab stand and street hail market experiences an oversupply of cabs, leading to deterioration of vehicle and driver quality. Applied to the dispatch market, however, entry restrictions often lead to deficiencies in taxicab availability."

Sam Schwartz, the noted traffic engineer and former New York City traffic commissioner, saw the advent of the so-called gypsy cab first-hand, back when he drove a yellow cab, and street riots prompted some taxi drivers to avoid neighborhoods in the Brooklyn and Bronx.

"That gave birth to the livery movement," he said, referring to the growth of the illegal-cab trade in the outer boroughs, offering New Yorkers unregulated taxi service in places where yellow cabs were unwilling to go.

"So the liveries started to accept hails and some of the yellows resented that," he said, adding that "they would burn each other's vehicles, and there was some violence that went on for a few years."

"Soon, the yellows would no longer drive people of color," he said.

Ultimately, it was agreed that the yellows would offer street hails and the liveries would concentrate on the boroughs, and the liveries were brought into the regulatory fold.

"Today's war, while not violent as the '60's battles were, has the potential to upset the industry as we have known it," said Schwartz, in an email. " Here's what yellows face today: UBER, UBERX, LYFT, GETT, VIA, Carsco.com, Bridj, LEAP, Black Line and more every day (not to mention the "greens"). Can this lead to deregulation? Yes.... Ultimately we are heading down a slippery slope to gridlock as virtually everyone can rent out a seat in his/her car at anytime ala Moscow which has about the worst traffic I've witnessed first-hand."

"I do predict that there will be a lot of problems," said Hodges. "And after [Uber] made tons more money, then we'll be back to regulation again."

*This article appeared in the November edition of* Capital *magazine.*

**EXHIBIT B**
(Crain's New York Business Article)

** Will print automatically! If it doesn't, click **here**. **



# Uber doubles number of drivers—just as de Blasio feared

More than 20,000 UberX drivers are roaming the streets of New York City, twice the number from September 2014. The mayor is scrutinizing their impact.

Andrew J. Hawkins



*Buck Ennis*
Uber is spreading across New York City.

**Published:** October 6, 2015 - 1:34 pm

The Uber wave that prompted Mayor Bill de Blasio to try to cap the ride-share company's growth appears to be gaining strength: The number of Uber drivers in New York City has almost doubled in the past year, and fare revenue per driver also has increased, according to the company.

Last September, 10,000 UberX drivers, which operate as black cars, were roaming the streets of New York City. By March 2015, about 13,000 car-service drivers were using Uber's app to arrange rides with passengers. By September, that number had grown to 20,000, as well as another 4,000 yellow- and green-cab drivers who can be hailed through Uber. Taken together with the company's limo, SUV and carpool services, there are now over 30,000 Uber-affiliated vehicles in New York City today.

According to a blog post that went up on Uber's website Tuesday, average UberX (non-taxi) gross fares per hour increased by 6.3% from September 2014 to September 2015. Last month, UberX drivers earned $39.30 per hour in fares on average, up from $36.96 last year. That figure is inflated by part-time Uber drivers who make themselves available when the company's surge pricing is in effect.

The San Francisco-based company says about 42% of its drivers are part-timers, logging into the service 15 hours a week or less. Also Uber drivers who frequently cancel rides, or whose customer ratings drop below 4.5 stars, can find themselves locked out of the system.

Uber says its drivers are spending less time cruising or waiting for customers to summon a ride, and more time with passengers in their vehicles. In September 2012, the first year Uber was active in New York, drivers spent 16 minutes per hour with passengers. That number has risen to 32 minutes in 2015.

Uber says it has grown the pie, meaning it has attracted riders who did not previously use car service as much, but its gains in market share have certainly put pressure on yellow cabs, livery cabs and black-car businesses. Credit unions that finance taxi-medallion purchases tried to force the city to stop Uber drivers from responding to smartphone hails, but a judge dismissed the lenders' lawsuit.

Which is not to say the city hasn't tried to stymie Uber in other ways. In June, [Mr. de Blasio unveiled a plan to cap Uber's growth](#) at 1% while his administration studied its impact on traffic congestion. Uber unleashed an ad campaign and an army of lobbyists, [forcing the mayor to retreat](#). The administration is now conducting a four-month traffic study, with data that Uber agreed to provide, after which it will likely propose a new plan to limit the company's growth, restarting the fight.

The concept of Uber's rapid growth conforms to numbers the city used to justify its plan. More than 25,000 new for-hire vehicle licenses have been issued since 2011, increasing by 63% a market that includes livery cabs and black cars, according to data released by the Taxi and Limousine Commission during the summer. Much of that growth has occurred in the past year: At least 2,000 licenses were handed out in each month of fiscal 2015, which ended June 30.

*Correction: Uber's algorithm does not prioritize drivers who log on to the service more frequently. That fact was misstated in a previous version of this article published online Oct. 6, 2015.*



Entire contents ©2016 Crain Communications Inc.

**EXHIBIT C**
(NYS Department of State, Division of Corporations Entity Information)

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through November 10, 2016.

Selected Entity Name: RED BULL TAXI INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | RED BULL TAXI INC. |
| **DOS ID #:** | 3233944 |
| **Initial DOS Filing Date:** | JULY 22, 2005 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
RED BULL TAXI INC.
25 E 86TH ST APT 9F
NEW YORK, NEW YORK, 10028

**Chief Executive Officer**

EVGENY A FRIEDMAN
25 E 86TH ST APT 9F
NEW YORK, NEW YORK, 10028

**Principal Executive Office**

RED BULL TAXI INC.
25 E 86TH ST APT 9F
NEW YORK, NEW YORK, 10028

**Registered Agent**

NONE

This office does not record information regarding the
names and addresses of officers, shareholders or

directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include the
name(s) and address(es) of the initial officers, directors,
and shareholders in the initial certificate of
incorporation, however this information is not recorded
and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUL 22, 2005 | Actual | RED BULL TAXI INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs    |    Privacy Policy    |    Accessibility Policy    |    Disclaimer    |    Return to DOS
Homepage    |    Contact Us

**EXHIBIT D**
(20 Largest Unsecured Creditors)

See attached.

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Red Bull Taxi Inc.** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | _____ |

☐ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 21st Century Advantage Ins. c/o Wenig & Wenig 150 Broadway, St 911 New York, NY 10038 | | Pending Litigation - Personal Injury Claimants | Contingent Unliquidated Disputed | | | Unknown |
| AIG Prop. a/s/o Marvin Schein c/o Wenig & Wenig PLLC 150 Broadway, St 911 New York, NY 10038 | | Pending Litigation - Personal Injury Claimants | Contingent Unliquidated Disputed | | | Unknown |
| Atlas Insurance 150 Northwest Point Blvd, 3rd Elk Grove Village, IL 60007 | | Insurance Premiums | Contingent Unliquidated Disputed | | | $6,000.00 |
| Demetrios A. Bothos, Esq. 3343 Vernon Blvd, St 101 Long Island City, NY 11106-4928 | | Unpaid legal fees | | | | $50.00 |
| Edward Davis | | Pending Litigation - Personal Injury Claimants | Contingent Unliquidated Disputed | | | Unknown |
| Fleetwood Agency 65 Broadway, #1104 New York, NY 10060 | | Premiums for January and February 2016 | Contingent Unliquidated Disputed | | | $8,500.00 |
| Geico a/s/o Joshi Keval c/o Office of Ricky J. Lucyk 170 Forehlich Farm Blvd Woodbury, NY 11797 | | Pending Litigation - Personal Injury Claimants | Contingent Unliquidated Disputed | | | Unknown |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | **Red Bull Taxi Inc.** | | Case number *(if known)* | |
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|
| Geico a/s/o Ron Williams c/o Offices of Ricky J. Lucyk 170 Forehlich Farm Blvd Woodbury, NY 11797 | | **Pending Litigation - Personal Injury Claimants** | **Contingent Unliquidated Disputed** | | | **Unknown** |
| Greg Root, Esq. 380 LExington Ave, Suite 1700 New York, NY 10168 | | **Unpaid legal fees** | | | | **$350.00** |
| Jeffrey Kramer, Esq. 26 Court Street, St 1507 Brooklyn, NY 11242 | | **Unpaid legal fees** | | | | **$450.00** |
| Mike Polinski, Esq. 29 Broadway Lynbrook, NY 11563 | | **Unpaid legal fees** | | | | **$400.00** |
| Northern Grub, LLC 7108 Northern Blvd Jackson Heights, NY 11377 | | **Prepetition Loan** | | | | **$75,000.00** |
| NYS Workers' Comp. Board 328 State Street Schenectady, NY 12305 | | **Notice Only** | **Contingent Unliquidated Disputed** | | | **$0.00** |
| State Farm a/s/o Alam c/o Nicolini, Paradise, Ferret 114 Old Country Road, St 500 Mineola, NY 11501 | | **Interest on judgment awarded in Index number 13628/13** | | | | **$302.50** |
| Tops Cab Corp. c/o Newman O'Malley & Epstein 217 Broadway, St 500 New York, NY 10007 | | **Litigation - Personal Injury Claimant** | | | | **Unknown** |
| Tunnel Taxi Management, LLC 44-07 Vernon Blvd Long Island City, NY 11101 | | **Management Agreement** | **Unliquidated Disputed** | | | **$0.00** |
| Washington International Insurance Co 475 N. Martingale Road, St 850 Schaumburg, IL 60173 | | **Insurance** | **Contingent Unliquidated Disputed Subject to Setoff** | | | **$9,441.00** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com                                                        Best Case Bankruptcy

| Debtor | **Red Bull Taxi Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|
| | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **West Side Claims Processing In 25 E. 86th St., Apt. 9F New York, NY 10028** | | **Prepetition Loans** | | | | **$75,000.00** |
| **Yelena Budnikova c/o Gary Lightman, Esq. 233 Broadway New York, NY 10279** | | **Pending Litigation - Personal Injury Claimants** | **Contingent Unliquidated Disputed** | | | **Unknown** |
| **Young Cho c/o Sim & Park 450 7th Ave, St 1805 New York, NY 10123** | | **Pending Litigation - Personal Injury Claimants** | **Contingent Unliquidated Disputed** | | | **Unknown** |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

**EXHIBIT E**
(5 Largest Secured Creditors)

See attached.

**Fill in this information to identify the case:**

Debtor name  **Red Bull Taxi Inc.**

United States Bankruptcy Court for the:  SOUTHERN DISTRICT OF NEW YORK

Case number (if known)

☐ Check if this is an
amended filing

## Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

**Part 1:     List Creditors Who Have Secured Claims**

| | | Column A | Column B |
|---|---|---|---|
| 2. List in alphabetical order all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim. | | **Amount of claim**<br>Do not deduct the value of collateral. | **Value of collateral that supports this claim** |

| 2.1 | **CAPITAL ONE TAXI MEDALLION** | | $2,048,491.27 | $1,500,000.00 |
|---|---|---|---|---|

Creditor's Name

**c/o Louis A. Curcio, Troutman**
**875 Third Avenue**
**New York, NY 10022**

Creditor's mailing address

**Describe debtor's property that is subject to a lien**
**New York City Taxi medallion Nos. 3G26, 3G27 and 9P55**

Creditor's email address, if known

**Describe the lien**
**UCC Filing**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Date debt was incurred**

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☑ Disputed

| | | |
|---|---|---|
| 3. | Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any. | $2,048,491.27 |

**Part 2:     List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | | |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

**EXHIBIT F**
(Assets and Liabilities)

**Assets**:
1.  3 Medallions
2.  Vehicle and taxi equipment
3.  Books and Records
4.  Management Agreement with Management Company
5.  Monthly payments from Management Company

**Liabilities**:
1.  Capital One Loan
2.  Tax Claims
3.  Personal Injury/Tort Claims
4.  Prepetition Unsecured Loan Claims
5.  General Unsecured Creditor Claims

# EXHIBIT G
(Publicly Held Debt & Equity Securities)

None.

**EXHIBIT H**
(Property in Custody of Others)

The Medallions are currently in the custody or control of Capital One, pursuant to its levy.

**EXHIBIT I**
(Real Property)

None.

**EXHIBIT J**

(Address of Books and Records; International Assets)


The Debtor's books and records are located at 25 East 86th St., Apt. 9F, New York, NY 10028.

The Debtor has no assets held outside the territorial limits of the United States.

**EXHIBIT K**
(Pending Actions With Imminent Judgments)

None.

**EXHIBIT L**
(Senior Management)

Evgeny Freidman is the sole officer and director of the Debtor.

**EXHIBIT M**
(30-Day Cash Flow)

Upon recovery of the Medallions and resumption of operations, the Debtor expects to receive a net amount equal to $4,500 per month from the Management Company.